# United States Court of Appeals for the Federal Circuit

---

**MILITARY-VETERANS ADVOCACY,**
*Petitioner*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

2019-1600

---

Petition for review pursuant to 38 U.S.C. Section 502.

-------------------------------------------------

**NATIONAL ORGANIZATION OF VETERANS' ADVOCATES, INC.,**
*Petitioner*

**PARALYZED VETERANS OF AMERICA,**
*Intervenor*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

---

2019-1680

---

Petition for review pursuant to 38 U.S.C. Section 502.

-------------------------------------------------

**CARPENTER CHARTERED,**
*Petitioner*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

———————————

2019-1685

———————————

Petition for review pursuant to 38 U.S.C. Section 502.

-------------------------------------------------

**PHILLIP BOYD HAISLEY, NATIONAL VETERANS
LEGAL SERVICES PROGRAM,**
*Petitioners*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

———————————

2019-1687

———————————

Petition for review pursuant to 38 U.S.C. Section 502.

———————————

Decided:  July 30, 2021

_____

ROBBIE MANHAS, Orrick, Herrington & Sutcliffe LLP, Washington, DC, argued for petitioner Military-Veterans Advocacy.  Also represented by MELANIE L. BOSTWICK; JOHN B. WELLS, Law Office of John B. Wells, Slidell, LA.

MICHAEL BERN, Latham & Watkins LLP, Washington, DC, argued for petitioner National Organization of Veterans' Advocates, Inc. and intervenor Paralyzed Veterans of America.  National Organization of Veterans' Advocates, Inc. also represented by GENEVIEVE PATRICIA HOFFMAN, ROMAN MARTINEZ, BARRETT TENBARGE.

LINDA E. BLAUHUT, Paralyzed Veterans of America, Washington, DC, for intervenor Paralyzed Veterans of America.

KENNETH M. CARPENTER, Law Offices of Carpenter Chartered, Topeka, KS, argued for petitioner Carpenter Chartered.

ALEX SCHULMAN, Paul Hastings LLP, Washington, DC, argued for petitioners Phillip Boyd Haisley, National Veterans Legal Services Program.  Also represented by STEPHEN BLAKE KINNAIRD; BARTON F. STICHMAN, National Veterans Legal Services Program, Washington, DC.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent in 2019-1600, 2019-1687.  Also argued by WILLIAM JAMES GRIMALDI in 19-1680, DAVID PEHLKE in 2019-1685.  Also represented by ERIC P. BRUSKIN, JEFFREY B. CLARK, MARTIN F. HOCKEY, JR., ROBERT EDWARD KIRSCHMAN, JR.; BRIAN D. GRIFFIN, ANDREW J. STEINBERG, Office of General Counsel, United

States Department of Veterans Affairs, Washington, DC; DAVID J. BARRANS in 2020-1687, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC.

_____

Before REYNA, CLEVENGER, and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*.

In 2017, Congress enacted the Veterans Appeals Improvement and Modernization Act (AMA) to reform the administrative appeals system of the Department of Veterans Affairs (VA). *See* Pub. L. No. 115–55, 131 Stat. 1105 (2017) (codified at scattered sections of 38 U.S.C.). The AMA replaced the existing VA appeals system, which had shepherded all denials of veteran disability claims through a one-size-fits-all appeals process. Under the AMA, claimants may now choose between three procedural options in response to an unfavorable initial decision: (1) filing a supplemental claim based on additional evidence, (2) requesting higher-level review within the VA based on the same evidentiary record, and (3) filing a notice of disagreement (NOD) to directly appeal to the Board of Veterans Appeals (Board). Pursuant to its notice-and-comment rulemaking authority, the VA promulgated a series of regulations to implement the AMA. *See VA Claims and Appeals Modernization*, 84 Fed. Reg. 138 (Jan. 18, 2019) (Final Rule). Several veterans' service organizations, a law firm, and an individual (collectively, Petitioners) filed four separate petitions raising thirteen rulemaking challenges to these regulations under 38 U.S.C. § 502.[1]

_____

[1]    Specifically, Petitioners include: Military-Veterans Advocacy (MVA) in *Military-Veterans Advocacy v. Sec'y of Veterans Affs.*, Appeal No. 19-1600; National

Before oral argument, we requested supplemental briefing on whether Petitioners have standing to challenge the regulations identified in their petitions. We conclude that two veterans' service organizations, MVA and PVA, have demonstrated associational standing based on claimed injuries to their members to collectively bring three of their seven challenges. Because we conclude that no Petitioner has demonstrated standing to raise any of the remaining challenges, we dismiss the petitions with respect to those challenges.

The three regulations for which MVA and PVA have standing to challenge all relate to supplemental claims—one of the three review lanes established by the AMA. Specifically, 38 C.F.R. § 14.636(c)(1)(i) limits when a veteran's representative may charge fees for work on supplemental claims; 38 C.F.R. § 3.2500(b) bars the filing of a supplemental claim when adjudication of the same claim is pending before a federal court; and 38 C.F.R. § 3.155 excludes supplemental claims from the intent-to-file framework. We hold that all three regulations are invalid for contravening the unambiguous meaning of their governing statutory provisions. Accordingly, we grant-in-part and dismiss-in-part MVA's and PVA's petitions in Appeal Nos.

---

Organization of Veterans' Advocates, Inc. (NOVA) and Paralyzed Veterans of America (PVA) in *Nat'l Org. of Veteran' Advocates, Inc. v. Sec'y of Veterans Affs.*, Appeal No. 19-1680; Carpenter Chartered in *Carpenter Chartered v. Sec'y of Veterans Affs.*, Appeal No. 19-1685; and Phillip Boyd Haisley and National Veterans Legal Services Program (NVLSP) in *Haisley v. Sec'y of Veterans Affs.*, Appeal No. 19-1687. These four appeals were treated as companion cases for purposes of oral argument. Because they involve overlapping legal issues and raise rulemaking challenges to related regulations, we address all four companion cases in this single opinion.

19-1600 and 19-1680, and we dismiss the remaining two petitions in Appeal Nos. 19-1685 and 19-1687 in their entirety.

BACKGROUND

I

Congress enacted the AMA in 2017 to reform the existing VA administrative appeals system, which was, by all accounts, "broken," marked by lengthy delays, and plagued with a formidable backlog of cases. *See* H.R. Rep. No. 115–135, at 5–8 (2017) ("The current backlog for appeals exceeds 470,000 claims and is growing."). Under the previous appeals system, often described as the "legacy system,"[2] veteran disability claimants had only one pathway to seek administrative review of an unsatisfactory initial decision on their disability claim from the agency of original jurisdiction (AOJ). This one-size-fits-all-claims pathway was long and complicated, regardless of the extent or nature of the claimant's disagreement with the initial decision. Claimants initiated an appeal by filing a NOD to the AOJ's decision, and after an elaborate set of steps, could have their claim reviewed by the Board.[3]

---

[2] The legacy system still applies to claims filed before the AMA effective date.

[3] Specifically, under the legacy system, after a veteran submits a claim to the VA, that claim is reviewed by the AOJ, typically one of the Veterans Benefits Administration's (VBA) fifty-six regional offices. J.A. 109. The AOJ's initial decision decides whether the claimant is entitled to compensation and, if so, how much. A claimant who is unsatisfied with that initial decision may initiate an appeal within one year of the decision's notification date by filing a NOD. J.A. 110. After receiving the NOD, the AOJ reviews the claim again, and if the disagreement cannot be

More problematic, however, was the "continuous evidence gathering and readjudication of the same matters" that caused appeals to "churn" in the system. *See* S. Rep. 115–126, at 29 (2017) (Jennifer S. Lee, Deputy Under Secretary for Health and Policy Services) ("Veterans and VA adjudicators are . . . engaged in continuous evidence gathering and repeated readjudication of the same appeal. This cycle of evidence gathering and readjudication means that appeals often churn for years between the Board and the [AOJ] to meet complex legal requirements, with little to no benefit flowing to the Veteran."). Because the legacy system permitted claimants to submit new evidence at virtually any time prior to a final Board decision—including at the Board hearing—nearly half of the appeals before the Board resulted in a remand to the AOJ for additional development and readjudication. The VA, moreover, had a statutory duty to assist the claimant in obtaining evidence in support of the appeal throughout the entire appeals process. The introduction of new evidence at the Board would

---

resolved, it issues a statement of the case (SOC) setting forth the agency's legal and factual position with respect to the disagreement. *Id.* The claimant then has sixty days to file a "[s]ubstantive [a]ppeal" to the Board (and request a hearing) by filing a form that provides "specific allegations of error of fact or law . . . related to specific items in the [SOC]." *See* § 20.202 (2018). The Board subsequently reviews the case and can either grant the requested relief, deny that relief, or remand the case to the AOJ for additional fact finding and readjudication. J.A. 111. A claimant dissatisfied with the Board's final decision may continue an appeal to the United States Court of Appeals for Veterans Claims (Veterans Court), and beyond the VA to our court and even to the Supreme Court. *Id.* Additionally, clear and unmistakable error (CUE), *see* § 5109A, and new and material evidence, *see* § 5108 (2016), claims allow for review of final judgments.

often result in a remand to the AOJ for readjudication of the claim in light of that evidence. Collectively, these features resulted in a protracted administrative appeals system in which claimants waited "an average [of] five years for a final decision" from the Board, which was expected to increase to "an average [of] ten years for a final appeals decision by the end of 2027." *See* H.R. Rep. No. 115–135, at 5.

As relevant here, the AMA sought to reduce inefficiencies of the legacy appeals system by introducing several statutory reforms. These amendments reflect Congress's goal of streamlining the administrative appeals system while still protecting claimants' due process rights. *See id.* ("To help ensure that veterans receive timely appeals decisions in the future . . . [t]he new appeals procedures created by this bill would reduce [the] VA's workload and help ensure that the process is both timely and fair."); *see also* S. Rep. No. 115–126, at 27 ("[T]he current system allows for repeated revisions and resubmissions of claims while maintaining an effective date for benefits based upon the original filing date of the claim. . . . The proposed changes are intended to significantly streamline the appeal process, which would allow appeals to be finalized in a shorter period of time with fewer employees.").

Central to the AMA's many reforms, claimants may now choose from three procedural lanes to obtain review of their claim within one year of the initial decision (in contrast to the legacy system's single pathway for appeal to the Board). 38 U.S.C. § 5104C(a)(1). Claimants may use only one lane at a time. § 5104C(a)(2)(A). Each lane has varying limitations on the submission of new evidence and the VA's duty to assist the claimant in obtaining such evidence.

The first lane is the filing of a supplemental claim, which allows a claimant to submit additional evidence to an AOJ for "readjudication" of the claim.

§§ 5104C(a)(1)(B), 5108. The second lane is a request for "higher-level review" made within one year of the AOJ's decision. §§ 5104B(b)(1)(B), 5104C(a)(1)(A). This lane offers review of the claim by a higher-level claims adjudicator at the AOJ that is based on the *same* evidentiary record as the initial claim (i.e., the claimant may not submit new evidence), and the VA has no duty to assist during the review. §§ 5104B(d), 5103A(e). The third lane is a direct appeal to the Board,[4] which a claimant initiates by filing a NOD within one year of the AOJ's initial decision. As with the legacy appeals system, this lane permits claimants to submit additional evidence and request a Board hearing, if they wish. Unlike the legacy system, however, claimants must specify in the NOD their intention to add to the record and submit the additional evidence within a certain time frame (i.e., within 90 days of the NOD's filing or the Board hearing). In another departure from the legacy system, wherein the VA's duty to assist continued while a claim was on appeal before the Board, the VA has no duty to assist during a Board appeal under the AMA's modified procedures. § 5103A(e).

Should one lane of review prove unsuccessful, claimants may sequentially pursue another lane of review while maintaining the original effective date of the initial claim, so long as they "continuously pursue" that claim by selecting an appropriate alternative lane within one year of an unsatisfactory AOJ, Board, or Veterans Court decision. § 5110(a)(2)–(3). But two consequences arise when the claim is no longer in continuous pursuit—that is, when a claimant waits more than one year to seek further review of an unsatisfactory AOJ, Board, or Veterans Court

---

[4]    In contrast to legacy Board appeals, this third lane eliminates "intermediate and duplicative steps . . . such as the [SOC] and the Substantive Appeal [form]." S. Rep. No. 115–126, at 30.

decision. First, at that time, claimants can no longer seek higher-level review or appeal to the Board but can only file a supplemental claim. *See* § 5104C(b). And second, any award under such a supplemental claim is no longer entitled to the initial claim's original effective date and will instead be assigned an effective date tied to the supplemental claim's date of receipt. § 5110(a)(3).

## II

On August 10, 2018, pursuant to its authority under 38 U.S.C. § 501(a) to "prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the [agency]," the VA published a notice of proposed rulemaking in the Federal Register inviting the public to comment on its proposed rules for implementing the AMA's reforms. *See VA Claims and Appeals Modernization*, 83 Fed. Reg. 39,818 (Aug. 10, 2018) (Proposed Rule). After receiving comments on the Proposed Rule, the VA promulgated the Final Rule on January 18, 2019, which along with the AMA[5] became effective on February 19, 2019.

Petitioners subsequently filed four separate petitions under § 502, collectively raising thirteen rulemaking

---

[5]   The amendments under the AMA apply to all claims for which notice of a decision is provided by the Secretary on or after the later of: (1) the date that is 540 days after August 23, 2017, and (2) the date that is 30 days after the Secretary submits to the appropriate committees of Congress a certification of required resources and a summary of performance outcomes. *See* 131 Stat. at 1115. As the VA submitted the required documentation to Congress on January 18, 2019, the effective date of the amendments made by the AMA was February 19, 2019. The date 540 days after the date of enactment of the AMA was February 14, 2019.

challenges to the validity of several regulations.[6] Specifically, Mr. Haisley and NVLSP's petition challenged 38 C.F.R. § 3.105(a)(1)(iv). MVA's petition also challenged § 3.105(a)(1)(iv) in addition to 38 C.F.R. § 14.636(c)(1)(i) and 38 C.F.R. § 20.202(c)(2). NOVA and PVA's petition challenged 38 C.F.R. § 3.155(b), 38 C.F.R. § 3.156(b), 38 C.F.R. § 3.2500(b), and 38 C.F.R. § 3.2500(d)–(e) and 38 C.F.R. § 20.205(c). And finally, Carpenter Chartered's petition raised all but three of the above challenges (§ 3.105(a)(1)(iv),[7] § 3.2500(d)–(e) and § 20.205(c), and § 14.636(c)(1)(i)) and further raised six additional challenges, to: 38 C.F.R. § 3.1(p)(1)–(2), 38 C.F.R. § 3.103(c)(2), 38 C.F.R. § 3.151(c)(1)–(2), 38 C.F.R. § 14.636(c)(2)–(3), 38 C.F.R. § 20.202(a), and 38 C.F.R. § 20.800(e).

The government's opening briefs opposed only NVLSP's and Carpenter Chartered's standing to challenge the implementing regulations. However, pursuant to our independent duty to verify standing, we requested supplemental briefing from each Petitioner to address "the precise grounds upon which it asserts standing to make each of the specific challenges raised by the petition." *See, e.g.*, Order Requesting Suppl. Briefing, No. 19-1600 (Sept. 16, 2020), ECF No. 55, at 1–2. Specifically, we asked

---

[6] The Petitioners presented the thirteen challenges as follows: (1) 38 C.F.R. § 3.1(p)(1)–(2); (2) 38 C.F.R. § 3.103(c)(2); (3) 38 C.F.R. § 3.105(a)(1)(iv); (4) 38 C.F.R. § 3.151(c)(1)–(2); (5) 38 C.F.R. § 3.155; (6) 38 C.F.R. § 3.156(b); (7) 38 C.F.R. § 3.2500(b); (8) 38 C.F.R. § 3.2500 (d)–(e) and 38 C.F.R. § 20.205(c); (9) 38 C.F.R. § 14.636(c)(1)(i); (10) 38 C.F.R. § 14.636(c)(2)–(3); (11) 38 C.F.R. § 20.202(a); (12) 38 C.F.R. § 20.202(c)(2); and (13) 38 C.F.R. § 20.800(e).

[7] Shortly before oral argument, Carpenter Chartered withdrew its challenge to § 3.105(a)(1)(iv). Petitioner's Notice, No. 19-1685 (Sept. 25, 2020), ECF No. 52.

Petitioners to demonstrate the "actual or imminent injuries in fact, which are (a) concrete and particularized, and (b) traceable to a specific regulation" being challenged. *Id.* at 2. We also requested briefing on issues specific to the precise theory of standing asserted. *See, e.g., id.* (requesting each Petitioner relying on associational standing to "demonstrate that they have a member that would otherwise have personal standing to challenge the specific regulations").

We have jurisdiction under § 502 to "directly review the validity of both the rulemaking process and the challenged VA regulations" in the Final Rule. *See Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*, 345 F.3d 1334, 1339 (Fed. Cir. 2003).

DISCUSSION

I. Standing

Before reaching the merits of Petitioners' challenges, we must first satisfy our "independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This obligation to assure standing extends to when a party seeks judicial review of final agency action, as Petitioners do here.

The "irreducible constitutional minimum of standing" consists of three elements. *Id.* First, a plaintiff must personally present an "injury in fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See id.* (cleaned up). This requirement ensures that the plaintiff has a "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Second, there must be a causal connection

between the injury and the conduct complained of—that is, plaintiff's injury must be "fairly traceable" to the challenged "putatively illegal conduct of the defendant," and not the result of independent action of some third party not before the court. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also California v. Texas*, 141 S. Ct. 2104, 2113–15 (2021) (no causation where plaintiffs' injury—cost of purchasing health insurance—is not "fairly traceable" to any "allegedly unlawful [government] conduct" because the challenged Patient Protection and Affordable Care Act (ACA) provision mandating health insurance coverage was rendered "unenforceable" upon elimination of the tax penalty for noncoverage). Lastly, it must be "likely" that the injury will be redressable by the requested relief. *Lujan*, 504 U.S. at 561; *see also California*, 141 S. Ct. at 2116 (no standing to challenge unenforceable ACA provision where plaintiffs sought only a declaratory judgment that provision is unconstitutional, which, by itself, is not an "acceptable Article III remedy" that can "redress a cognizable Article III injury").

Petitioners bear the burden of establishing these elements under the same standard that is applied at the summary judgment stage. *See Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1172–73 (Fed. Cir. 2017) (adopting the summary judgment burden of production in cases challenging final agency action). In other words, instead of resting on "mere allegations," a plaintiff must set forth by affidavit or other evidence "specific facts" to adequately support its contentions. *See Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

With respect to injury in fact, the Supreme Court has cautioned that "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the 'some day' will be—do not support a finding of . . . actual or imminent injury." *Lujan*, 504 U.S. at 564 (cleaned up) (no actual or imminent injury where affiants

merely professed intent to visit endangered species without concrete plans to do so). Nor can generalized allegations of harm untethered to the "application of the challenged regulations" establish a "concrete and particularized" injury. *See Summers*, 555 U.S. at 495 (no standing where harm alleged was "not tied to application of the challenged regulations" and did not identify a particular project subject to the challenged regulations that would impede petitioner's specific and concrete interests); *see also Lujan*, 504 U.S. at 566–67 ("pure speculation and fantasy" or an "ingenious academic exercise in the conceivable" is insufficient to establish injury for standing).

Plaintiffs claiming standing to challenge the validity of a statute or regulation must generally assert an injury that is caused by that statute's or regulation's "actual or threatened *enforcement*, whether today or in the future." *California*, 141 S. Ct. at 2114. Where, as here, plaintiffs seek *pre*-enforcement review, the Supreme Court has required plaintiffs to show that "the likelihood of future enforcement is 'substantial.'" *Id.* In other words, while a plaintiff need not "await the consummation of threatened injury to obtain preventive relief," it must demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" or show that the injury is "certainly impending." *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1370 (Fed. Cir. 2007) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) (plaintiff must demonstrate that "he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013) (allegation of future injury may suffice if threatened injury is "certainly impending" or there is a "substantial risk" the harm will occur).

We now turn to Petitioners' thirteen rulemaking challenges. All but two of these challenges address regulatory

provisions concerning procedural and substantive require-
ments for obtaining VA benefits—involving, e.g., initial
claims, administrative review, and CUE claims.  The re-
maining two challenges involve regulatory provisions gov-
erning attorneys' fees for representing claimants in VA
proceedings.

Petitioners consist of several veterans' service organi-
zations, a law firm, and an individual.  Collectively, they
assert numerous theories of associational standing (on be-
half of both veteran and attorney members), organizational
standing, third-party standing, and personal standing.  We
address each in turn.

## A.  Associational Standing

MVA, NOVA, and PVA (collectively, the Associations)
claim associational standing on behalf of their members,
which requires an Association to demonstrate that "(a) its
members would otherwise have standing to sue in their
own right; (b) the interests it seeks to protect are germane
to the [Association's] purpose; and (c) neither the claim as-
serted nor the relief requested requires the participation of
individual members in the lawsuit." *Hunt v. Wash. State
Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The As-
sociations assert different theories of associational stand-
ing on behalf of both their veteran members and their
attorney members.

We note, as an initial matter, that as to *Hunt*'s second
and third prongs, the parties' only dispute is whether
NOVA (and no other Petitioner) satisfies the second prong
of associational standing—i.e., whether the interests
NOVA seeks to protect are germane to its purpose.  The
government argues that NOVA's petition is not germane to
the purposes enumerated in its bylaws, which are focused
on ensuring that its members, as advocates, offer informed
representation to veterans seeking benefits from the VA.
Resp't Suppl. Br. (No. 19-1680) at 12–13.  This court, how-
ever, recently resolved this dispute in NOVA's favor in

*National Organization of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs*, where we explained that NOVA's purpose is not as narrow as the government contends and more generally relates to "helping veterans obtain fair compensation for their claims"—which is "precisely the interest NOVA now seeks to protect in challenging" these rules. 981 F.3d 1360, 1371 (Fed. Cir. 2020) (en banc) (*NOVA*). Accordingly, we conclude that the Associations satisfy the second and third prongs of associational standing. Below, we address only *Hunt*'s first prong as to the Associations' veteran and attorney members.

### 1. *Hunt*'s First Prong:  Veteran Members

The Associations make six rulemaking challenges[8] asserting associational standing on behalf of their veteran members, relying on *Disabled American Veterans v. Gober*, 234 F.3d 682 (Fed. Cir. 2000) (*DAV*). *DAV* held, in relevant part, that petitioner NOVA had satisfied *Hunt*'s first prong of associational standing because "NOVA includes at least one veteran as a member," and all veterans are "personally affected by the [challenged] rules," which impact their abilities to bring CUE claims. *See id.* at 689. Notably, *DAV* did not require NOVA to identify a specific veteran member that presented an injury that is actual or imminent, concrete, particularized, and fairly traceable to the challenged CUE rules.

Shortly after oral argument occurred in this case, however, this court, sitting en banc in *NOVA*, partially overruled *DAV* insofar as "it held that [standing] can be

---

[8]    (1)    § 3.105(a)(1)(iv);    (2)    § 20.202(c)(2);    (3) § 3.2500(b); (4) § 3.2500 (d)–(e) and § 20.205(c); (5) § 3.155; and (6) § 3.156(b). The Associations assert associational standing to challenge § 14.636(c)(1)(i) only on behalf of their attorney members, discussed *infra*, not their veteran members.

established solely on the basis of NOVA member veteran status without identification of an individual affected member, the nature of [the] claimed injury, and the reasons that the challenged interpretive rule would adversely affect [that] member." 981 F.3d at 1369. Instead, an organization challenging VA rulemaking based on associational standing must show that it has at least one veteran member with an actual or potential claim that could be affected by the challenged rule. *See id.* at 1369–70.

As applied here, we begin our associational standing analysis by asking whether at least one Association has at least one veteran member with an actual or potential claim that could be affected by the challenged rules at issue. In response to our request for supplemental briefing on this issue, the Associations submitted evidence in the form of signed declarations by some of their members. For the reasons below, we conclude that PVA has met its burden as to *Hunt*'s first prong for only two of the six rulemaking challenges.

First, § 3.2500(b) bars claimants from filing a supplemental claim based on new and relevant evidence while judicial review of their initial claim is pending on appeal in federal court. Clarence Noble, a PVA member and veteran, appealed the denial of his initial benefits claim to federal court, and while that appeal was pending, received new and relevant evidence he sought to submit in a supplemental claim. Under § 3.2500(b), however, Mr. Noble was barred from filing a supplemental claim because of his pending judicial appeal, thereby preventing him from timely applying for (and receiving) benefits based on this new evidence.

Second, § 3.155 excludes supplemental claims from the intent-to-file framework, which, by contrast, continues to apply to initial claims. Under this rule, a claimant filing a supplemental claim cannot rely on a preliminary submission to serve as an effective date placeholder. Stephen C.

Schwenker, a PVA member and veteran of the United States Air Force, submitted his intent to file a supplemental claim, which the VA received on July 24, 2018. Mr. Schwenker believed he had one year from that date to gather the evidence necessary to demonstrate service-connection for his multiple sclerosis claim. While he was eventually awarded service-connection, the effective date of his award was September 17, 2019 (presumably, the day his formal supplemental claim was received), rather than July 24, 2018. Section 3.155 thus deprived him of an earlier effective date (and, as a result, additional benefits) based on the date of his intent-to-file submission.

Accordingly, we conclude that the facts alleged as to Mr. Noble and Mr. Schwenker establish that these PVA veteran members suffered an injury in fact that is fairly traceable to the alleged shortcomings of the challenged regulations, *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and as a result, PVA has associational standing on behalf of its veteran members to challenge § 3.2500(b) and § 3.155, *see NOVA*, 981 F.3d at 1370. Moreover, this evidence is in the form of signed member declarations setting forth specific facts, which is sufficient to meet the summary judgment burden of production applied to direct challenges of agency action. *See id.* (citing *Phigenix*, 845 F.3d at 1172–73, and *Lujan*, 504 U.S. at 561).

By contrast, the allegations pertaining to the four remaining challenges are too vague or speculative to establish an injury in fact. The allegations with respect to § 20.202(c)(2) and § 3.156(b), for example, fail to identify any particular veteran member who has presented an actual or imminent harm as a result of these regulations. NOVA and PVA also challenge § 3.2500(d)–(e) and § 20.205(c), which collectively limit a claimant's options for switching administrative review lanes more than a year after the initial decision. But the declarants merely allege that they are currently pursuing one form of administrative review and speculate that they may want to switch to

another lane of administrative review at some point in the future. While standing may be predicated on future harm, these declarations express nothing more than "'some day' intentions," which fail to demonstrate that a particular veteran member faces "actual or imminent injury" if foreclosed from switching lanes after one year. *See Lujan*, 504 U.S. at 564.

Lastly, MVA challenges § 3.105(a)(1)(iv), which precludes a change in law (e.g., a change in the interpretation of a statute) from serving as the basis for a CUE claim. The only affected veteran member MVA specifically identifies is Michael Hodge, who is a Blue Water Navy veteran. Such veterans were previously ineligible for benefits based on a statutory interpretation that was later overturned in *Procopio v. Wilkie*, 913 F.3d 1371 (Fed. Cir. 2019) (en banc). Based on this new statutory interpretation, Mr. Hodge filed a CUE claim seeking revision of the pre-*Procopio* VA decision that denied his original claim for benefits in 2010. But the VA, citing § 3.105(a)(1)(iv), purportedly disregarded Mr. Hodge's CUE claim and, instead, required him to file a supplemental claim. One difference between a supplemental claim and a CUE claim pertains to the claim's original effective date: While a successful CUE claim provides benefits retroactive to the effective date of the claimant's original claim, a supplemental claim filed more than one year after the initial decision generally provides no retroactive benefits and is effective only as of the date the supplemental claim itself is filed. *See* § 5110(a)(3).

But as MVA concedes, Congress has already provided Blue Water Navy veterans with the relief they would have obtained had their CUE claim been allowed to proceed. *See* Pet'r Suppl. Br. (No. 19-1600) at 4 n.1. The Blue Water Navy Vietnam Veterans Act, Pub. L. No. 116–23, 133 Stat. 966 (2019) (codified at scattered sections of 38 U.S.C.), allows such veterans to receive retroactive effective dates for finally denied claims reconsidered and granted under the new law. Because the Act provides Blue Water Navy

veterans with the *same* benefits that they otherwise would
have received under the CUE pathway, we discern that as
to Mr. Hodge, MVA failed to sufficiently present an actual
or imminent harm fairly traceable to § 3.105(a)(1)(iv).  We
therefore conclude that Mr. Hodge lacks personal standing
to challenge this regulation, and MVA cannot claim associ-
ational standing on his behalf.

2. *Hunt*'s First Prong:  On Behalf of Attorney Members

The Associations also claim associational standing on
behalf of their attorney members to make two sets of rule-
making challenges:  the same six challenges to rules gov-
erning a veteran's claim for benefits addressed in the
previous section (*supra* § I.A.1), and a challenge to
§ 14.636(c)(1)(i), which limits when attorneys' fees may be
charged for work on veterans' benefits proceedings.  Be-
cause we have previously concluded that PVA has standing
on behalf of its veteran members to make two of these chal-
lenges (the challenges to § 3.2500(b) and § 3.155), we only
address the Associations' arguments as to the remaining
four challenges, to:  (1) § 3.105(a)(1)(iv); (2) § 20.202(c)(2);
(3) § 3.2500 (d)–(e) and § 20.205(c); and (4) § 3.156(b).  We
also address the Associations' arguments as to
§ 14.636(c)(1)(i).

With respect to the four challenges addressed above,
the Associations argue that their attorney members are in-
jured because these rules make it more difficult for their
veteran clients to obtain benefits, which, in turn, "dimin-
ish[es] the contingency fees [attorneys] will be able to earn"
under such rules.  Pet'rs Suppl. Br. (No. 19-1680) at 8.  The
Associations contend that both this court and the Supreme
Court have already recognized that "these sorts of direct
economic injuries to lawyers are adequate injury in fact to
meet the constitutional minimum of Article III standing."
*Id.* at 11 (citing *Caplin & Drysdale, Chartered v. United
States*, 491 U.S. 617, 623 n.3 (1989); *Kowalski v. Tesmer*,
543 U.S. 125, 129 n.2 (2004); and *Willis v. Gov't*

*Accountability Off.*, 448 F.3d 1341, 1348 (Fed. Cir. 2006)). For the reasons below, we decline to find the Associations have associational standing on behalf of their attorney members to make these four challenges, which concern the benefits that claimants can receive and not the contingency fees that their attorneys can recover.

As an initial matter, all three of the Associations' cited cases involve third-party standing, and not associational standing. In third-party standing, an attorney seeks to assert a legal right belonging to a third party—i.e., the attorney's *client*—based on a close attorney-client relationship and the client's inability to assert its own rights. *See Kowalski*, 543 U.S. at 130. The Associations' proposed theory of associational standing, on the other hand, purports to assert a legal right to fees belonging to their attorney members, such that those members "would otherwise have standing to sue in their own right." *See Hunt*, 432 U.S. at 343. We are unaware of any binding authority recognizing that attorneys have a "legally protected interest" in safeguarding their fees against regulations that govern a client's benefits claim; nor have we seen a case holding that attorneys personally have standing to challenge such regulations in their own right. To decide otherwise would lead to the peculiar conclusion that an attorney has personal standing (and the service organization to which the attorney belongs has associational standing) to raise a rulemaking challenge whenever an agency promulgates a regulation that could negatively impact a client's ability to obtain benefits.

Even setting aside the fundamental distinctions between third-party standing and associational standing, the Associations' cited cases are readily distinguishable. Both *Caplin* and *Willis*, for instance, emphasize the petitioner's certainty of recovery in establishing injury in fact based on attorneys' fees. *Caplin* concluded that a law firm asserting third-party standing on behalf of its client had established an injury in fact fairly traceable to the challenged action

because the action prevented the firm from collecting a fee to which it was "almost certainly" entitled. *See* 491 U.S. at 623 n.3 ("[T]here can be little doubt that petitioner's stake in $170,000 of the forfeited assets—which it would almost certainly receive if the Sixth Amendment claim it advances here were vindicated—is adequate injury in fact to meet the constitutional minimum of Article III standing."). Likewise, in *Willis*, the outcome of the proceedings had already been adjudicated in the client's favor, and the attorney was undisputedly entitled to fees as a result. *See* 448 F.3d at 1348. This certainty is especially important where, as here, "[petitioner] is not himself the object of the government action . . . he challenges" because standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 561–62. Under such circumstances, standing hinges on the "unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at 562. Petitioners, then, bear the burden to "adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury." *Id.*

Here, however, the Associations' allegations lack the certainty of recovery demonstrated in *Caplin* and *Willis* and, instead, are based on mere speculation that the challenged rules will preclude their clients from obtaining benefits that they otherwise could have filed for and might have been awarded, which, in turn, would "diminish" their contingency fees. NOVA and PVA, for instance, challenge § 3.156(b)—which governs the submission of new and material evidence while a claim is pending under the legacy system—yet fail to identify a single attorney member with a client subject to this rule, let alone a concrete and specific set of circumstances that would lead to diminished fees. *See* Pet'rs Suppl. Br. (No. 19-1680) at 10 ("[S]ome NOVA members *reasonably expect* to represent veterans harmed by the elimination of effective date protection for such

evidence." (emphasis added)). MVA challenges § 20.202(c)(2) but, at most, asserts that this rule has dissuaded its attorneys from taking on clients they feel are likely to receive denials. *See* Pet'r Suppl. Br. (No. 19-1600) at Tab 3, Decl. of Robin Hood ¶ 4 (asserting that § 20.202(c)(2) has caused him to "turn down [claimants] that [have] chosen a [Board] lane that does not let them adequately develop their claim and [are] foreclosed . . . from amending their choice" because the "claimant will most likely get a denial and [he] won't be able to earn any fees on a denial"). Similarly, for § 3.2500(d)–(e) and § 20.205(c), which limit switching of administrative review options after one year, NOVA and PVA allege that an attorney member represents a client who originally selected one lane but, because of this rule, is unable to switch into a potentially faster lane without losing his effective date. *See* Pet'rs Suppl. Br. (No. 19-1680) at Tab 3, Decl. of Robert Chisholm ¶ 8. But these alleged facts fail to establish that the rule presents a concrete threat of diminished attorneys' fees and, at best, merely indicate a possible delay in when the client receives benefits. Accordingly, even if diminished attorneys' fees can suffice as an injury in fact in some instances, the Associations' allegations as to these challenged regulations are simply too speculative.

As for § 3.105(a)(1)(iv), which excludes a change in judicial interpretation as a basis for CUE, MVA contends that this rule precludes its Blue Water Navy veteran clients from filing *Procopio*-based CUE claims, leaving them with only supplemental claims as a route for administrative review. This purportedly harms its attorneys because § 14.636 precludes them from recovering any fees for the majority (if not all) of their work on such supplemental claims. *See* Pet'r Suppl. Br. (No. 19-1600) at Tab 1, Decl. of John B. Wells ¶ 7. We decline to subscribe to this theory of standing for several reasons. As a threshold matter, we recently addressed and rejected a similar challenge to the validity of this regulation in *George v. McDonough*, 991

F.3d 1227 (Fed. Cir. 2021) (holding that CUE cannot arise from a subsequent change in interpretation of law by the agency or judiciary). Having already resolved the merits of MVA's challenge to § 3.105(a)(1)(iv), we decline to hold that it has standing based on a potential loss of attorneys' fees, given that "an 'interest in [attorneys'] fees is insufficient to create an Article III case[-]or[-]controversy where none exists on the merits of the underlying claim.'" *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990)); *see also Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) ("[A]n interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes."). We also observe that MVA's alleged injury to its attorneys' ability to recover fees for supplemental claims is not directly caused by § 3.105(a)(1)(iv) but rather § 14.636, which MVA also challenges. Thus, even assuming that MVA has established a concrete injury in fact, it has nonetheless failed to demonstrate that this injury is "directly traceable" to the specific rule being challenged. *See California*, 141 S. Ct. at 2117; *see also Summers*, 555 U.S. at 495 (no standing where harm alleged was "not tied to application of the challenged regulations").

Moreover, far from approving the fee-based theory of injury that the Associations advance here, *Kowalski* carefully "assume[d], *without deciding*" that petitioners' allegations regarding economic injury as to their diminished fees were "sufficient" to demonstrate injury in fact. *See* 543 U.S. at 129 n.2 (emphasis added); *id.* at 129 ("In this case, we do not focus on the constitutional minimum of standing, which flows from Article III's case-or-controversy requirement. Instead, we shall assume the attorneys have satisfied Article III and address the alternative threshold question whether they have standing to raise the rights of others." (cleaned up)). Accordingly, the Associations' cited

cases fail to support standing on behalf of their attorney members.[9]

Lastly, we address MVA's claimed standing to challenge § 14.636(c)(1)(i). Unlike the other four challenges at issue, this rule directly affects attorneys' fees—by restricting fees for work performed on supplemental claims filed more than a year after the initial decision, but not for any other type of claim. Looking to the specific facts alleged, we find them sufficient to establish constitutional standing. Specifically, John B. Wells, an MVA member and attorney, alleges that, under this rule, he personally was denied "over $50,000 in fees . . . for work [performed on] a supplemental claim older than one year." We thus hold

---

[9] Even if we were to conclude that the Associations have constitutional standing to challenge these regulations on behalf of their attorney members, we are skeptical that these members would fall within the class whom Congress has authorized to seek review under the Administrative Procedure Act (APA). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (clarifying that the zone-of-interests analysis asks the statutory question of whether a "legislatively conferred cause of action encompasses a particular plaintiff's claim"). While the zone-of-interests test is not especially demanding, the Associations' grievance of diminished attorneys' fees appears to be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987). Nothing in the relevant AMA statutory provisions speaks to or even suggests that Congress intended to authorize attorneys to challenge these rules to protect their fees; instead, these provisions were "obviously enacted to protect the interests of" veterans and the VA itself, not attorneys. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

that MVA has associational standing on behalf of its attorney members to challenge the validity of this regulation.

### B. Organizational Standing

Petitioners NVLSP, MVA, NOVA, and PVA (collectively, the Organizations) next claim that they have organizational standing in their own right (and not on behalf of their members) to make the seven rulemaking challenges discussed above. Because we previously concluded that PVA and MVA collectively have standing to make three of these challenges, we only address the Organizations' arguments as to the remaining four challenges, to: (1) § 3.105(a)(1)(iv); (2) § 20.202(c)(2); (3) § 3.2500 (d)–(e) and § 20.205(c); and (4) § 3.156(b).

Organizational standing, like any other theory of standing, requires an Organization to demonstrate the three elements of injury in fact, causation, and redressability. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). To prove an injury in fact, an Organization must establish a "concrete and demonstrable injury to the [O]rganization's activities"— such as a "perceptibl[e] impair[ment]" of the Organization's mission—"with the consequent drain on the [O]rganization's resources." *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

In the present case, the Organizations claim that the challenged rules purportedly make it more difficult for veterans to obtain benefits, thereby frustrating the Organizations' general purpose of helping veterans obtain benefits and draining their resources on educational guidance. We conclude that this asserted harm does not satisfy the *Havens* standard for organizational standing.

Demonstrating a concrete organizational injury requires more than showing a "setback to [an] organization's abstract social interests." *Id.* at 379. The injury thus cannot be merely ideological, meaning that damage to the

"special interest" of an organization does not qualify as an injury in fact; otherwise, "there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived." *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (*FWW*) ("An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995))).

As our sister court, the D.C. Circuit, has explained, allegations that "the defendant's conduct perceptibly impaired the organization's ability to provide services," such as when "the defendant's conduct causes an 'inhibition of [the organization's] daily operations,'" suffice to establish a concrete injury to an organization's interest. *FWW*, 808 F.3d at 919 (quoting *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)). Moreover, the consequent "drain" on resources must go beyond normal operating costs—that is, an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others" unless doing so subjects the organization to "operational costs beyond those normally expended." *Nat'l Taxpayers Union*, 68 F.3d at 1434; *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (organization's expenditures must be for "operational costs beyond those normally expended to carry out its advocacy mission"). An organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy are likewise insufficient to give rise to an Article III injury. *FWW*, 808 F.3d at 919.

*Havens* itself is instructive on this point. There, the organization's (HOME) purpose was to provide clients with equal opportunity housing opportunities and information, pursuant to a federal law that provided a legal right to

truthful, nondiscriminatory housing information. HOME claimed organizational injury when a real estate company, Havens Realty, engaged in unlawful racial steering practices, which directly unraveled and frustrated HOME's nondiscriminatory counseling and referral services, requiring it to expend additional resources to counteract Havens Realty's misinformation. 455 U.S. at 379; *see also PETA*, 797 F.3d at 1100 (Millett, J., dubitante) ("Put simply, what HOME used its own resources, information, and client base to build up, Havens Realty's racist lies tore down. That is the type of direct, concrete, and immediate injury that Article III recognizes.").

Here, the Organizations' allegations are insufficient to satisfy the *Havens* test. What the Organizations describe falls short of a "perceptibl[e] impair[ment]" to their conduct of daily operations or to advancing their purpose and mission of providing services. The challenged rules, as discussed, merely seek to streamline procedures for filing and obtaining administrative review of benefits claims, not directly foreclose claimants from obtaining benefits; nor can it be argued that these rules impair or unwind the Organizations' efforts in counseling and representing veterans in the benefits process (or otherwise block the Organizations' efforts to carry out their missions). As for the purported drain on the Organizations' resources, expenditures on educational programs to inform veterans of the governing regulatory provisions are merely part of the ordinary course of the Organizations' operations. For these reasons, we decline to conclude that NVLSP, MVA, NOVA, and PVA have organizational standing to challenge these rules.

## C. Third-Party Standing and Personal Standing

### 1. Mr. Haisley and NVLSP

Mr. Haisley and NVLSP filed a joint petition challenging the validity of a single regulation, § 3.105(a)(1)(iv), pertaining to the scope of CUE. Mr. Haisley argues that he has personal standing to challenge this regulation as a

Blue Water Navy veteran.  We already addressed and rejected this argument with respect to MVA's challenge to this same regulation, and we do so again here.

Mr. Haisley also separately argues personal standing based on his plans to allege CUE with respect to the Regional Office's decision on his claim for prostate cancer. Specifically, he contends that he was initially awarded a 100% disability rating for this claim in June 2016 while he had "active malignancy," which was then lowered to 20% in March 2020 after he had completed cancer treatment and was left with "residual complications of prostate cancer." *See* Pet'rs Suppl. Br. (No. 19-1687) at Tab 1, Decl. of Phillip B. Haisley ¶ 3.  We decline to find standing on these facts.  When Mr. Haisley's declaration was filed, the ratings decision lowering his disability rating to 20% was still nonfinal.  We find it difficult to understand why Mr. Haisley would purportedly let that decision become final to pursue a CUE claim, instead of timely initiating administrative review within one year based on the alleged error.  Second, and more importantly, based on the specific facts alleged, if Mr. Haisley were to file a CUE claim, it appears that it would be based on an erroneous application of the ratings schedule, and not a change in judicial interpretation as addressed by § 3.105(a)(1)(iv).  For these reasons, we conclude that Mr. Haisley fails to establish personal standing to challenge this regulation.

Next, NVLSP argues that it has third-party standing to challenge the CUE regulation.  Third-party standing requires a Petitioner to demonstrate that (1) it has suffered an injury in fact giving it a sufficiently concrete interest in the outcome of the issue in dispute and otherwise satisfies Article III's case-or-controversy requirement; (2) it has a "close" relationship with the third party that possesses the right being asserted; and (3) there exists some "hindrance" to that third party's ability to protect its own interests. *Kowalski*, 543 U.S. at 130.  Here, NVLSP alleges it has third-party standing because it "currently represents"

unnamed veterans before the Veterans Court "who seek re-view of a [Board] decision that rejected the argument that the challenged final agency decision contains CUE." *See* Pet'rs Suppl. Br. (No. 19-1687) at Tab 2, Decl. of Barton F. Stichman ¶ 5. We disagree.

NVLSP does not identify a single veteran with whom it has a close relationship who has had the CUE rule applied to them, or who has an imminent, "substantial risk" of hav-ing the rule applied to them. Nor do NVLSP's allegations specify if the CUE argument these veterans seek to ad-vance is premised on a change in judicial interpretation, as specified in the challenged regulation. But even aside from these issues, it is unclear what injury in fact NVLSP suf-fers that shows it has a personal stake in the outcome of a challenge to this regulation. NVLSP first relies on organi-zational injury—an argument which we have already con-sidered and rejected above. Next, citing *United States Department of Labor v. Triplett*, 494 U.S. 715 (1990), NVLSP argues that advocates have standing to challenge restrictions preventing them from pursuing desired rela-tionships with claimants and, here, the CUE rule purport-edly restricts its ability to represent certain veterans whose claims are excluded from the scope of CUE. Pet'rs Suppl. Br. (No. 19-1687) at 8–9. But *Triplett* (and similar cases in this line) addressed enforcement of a fee restriction statute that applies directly "against the *litigant* [i.e., ad-vocate]" and "prevents a third party from entering into a relationship with the litigant . . . , to which relationship the third party has a legal entitlement," i.e., "due process right to obtain legal representation." 494 U.S. at 720 (em-phasis added); *Kowalski*, 543 U.S. at 131 (explaining that *Triplett* "falls within that class of cases where we have al-lowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the liti-gant would result indirectly in the violation of third parties' rights"). Here, however, the challenged regulation applies

to the third-party claimant's CUE claim, and not to the attorney or to the attorney's relationship with the claimant.

Turning to the hindrance prong of third-party standing, NVLSP argues that claimants face significant obstacles to bringing suit in their own right due to the difficulties of navigating the VA administrative system. Pet'rs Suppl. Br. (No. 19-1687) at 13–14 (citing *Rosinski v. Wilkie*, 31 Vet. App. 1, 10 (2019)). But the generic obstacle NVLSP describes would purportedly hinder *all* veterans from protecting their interests with respect to *any* VA regulation and fails to demonstrate how any of its clients are hindered from challenging the CUE regulation at issue. *Kowalski*, moreover, rejected a similar argument that indigent criminal defendants are generally hindered from advancing their own constitutional rights because they are unable to navigate the appellate process pro se. *See* 543 U.S. at 132. While an attorney would be valuable to veterans challenging the validity of the CUE regulation, we do not think that the lack of an attorney here is the type of hindrance necessary to allow another to assert the claimant's rights, particularly in view of *Kowalski*'s finding that even pro se criminal defendants were not hindered enough for third-party attorney standing. *See id.*; *see also In re Stanley*, 9 Vet. App. 203, 213 (1996) ("VA claimants do not face the type of obstacles to bringing their own challenges that ordinarily weigh in favor of finding third-party-rights standing."). Additionally, NVLSP's clients appear to have representation to advance their interests—NVLSP itself.

### 2. Carpenter Chartered

Lastly, Carpenter Chartered, a law firm, asserts both personal standing and third-party standing on behalf of its clients. Its petition makes all but three of the challenges addressed above (§ 3.105(a)(1)(iv), § 3.2500(d)–(e) and § 20.205(c), and § 14.636(c)(1)(i)), and also raised six additional challenges, to: § 3.1(p)(1)–(2), § 3.103(c)(2), § 3.151(c)(1)–(2), § 14.636(c)(2)–(3), § 20.202(a), and

§ 20.800(e), mostly pertaining to the procedures and substance of claim filings and administrative review, with the exception of § 14.636(c)(2)–(3), which governs attorneys' fees.

Carpenter Chartered's theory of personal standing bears similarities to organizational standing; as a law firm specializing in VA benefits law, it urges that it should be treated like a veterans' service organization. Carpenter Chartered also cites *Rosinski*, 31 Vet. App. 1, as purportedly establishing that law firms may have personal standing to challenge regulations such as those at issue here. We decline to conclude that a law firm has personal standing to challenge these rules for reasons similar to those already expressed for associational standing on behalf of attorney members. Carpenter Chartered has failed to establish how it suffers an injury in fact as a result of the challenged rules—especially where none of those rules (save for one) implicates attorneys. The one exception for which we might have found personal standing is § 14.636(c)(2)–(3), governing attorneys' fees for claims assessed under prior versions of § 5904(c)(1). Carpenter Chartered contends that § 5904(c)(1) as amended under the AMA must apply to all claims regardless of when a decision issued, and that § 14.636(c)(2)–(3), which limit the applicability of amended § 5904(c)(1) to claims with a decision issued on or after the AMA's effective date, are invalid. Pet'r Br. (No. 19-1685) at 42–45. Yet Carpenter Chartered merely alleges by declaration that these regulations will harm both the firm and its clients—it fails to point to an example claim in which it, under its interpretation, could receive retroactive effect or allege any specific facts demonstrating how this rule may cause such injury. We therefore decline to find personal standing here.

Finally, Carpenter Chartered claims that it has third-party standing on behalf of its veteran clients and, to that end, submits several signed declarations from those clients. But as we explained for NVLSP's third-party

standing argument, we reject this theory for at least the reason that Carpenter Chartered has failed to establish that its clients are hindered from bringing suit in their own right.  This rings especially true as each and every one of Carpenter Chartered's declarants avers that he is a client of Carpenter Chartered and would have pursued an action in his own right, if requested.  *See, e.g.*, Pet'r Suppl. Br. (No. 19-1685) at Tab 1, Decl. of Randy B. Bomhoff, Jr. ¶ 3 ("I would have allowed Carpenter Chartered to have filed this challenge in my name.").  Accordingly, we also decline to find third-party standing under these circumstances.

## II.  Validity of Challenged Regulations

### A.  Standard of Review

Having determined that Petitioners lack standing to challenge all but three of the regulations raised in their petitions, we now turn to the merits of those challenges.

We review petitions under § 502 in accordance with the APA, as codified in relevant part at 5 U.S.C. § 706.  *See Nyeholt v. Sec'y of Veterans Affs.*, 298 F.3d 1350, 1355 (Fed. Cir. 2002).  Under § 706, we must "hold unlawful and set aside agency action" we find "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  § 706(2); *see also Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (regulation must be set aside for being arbitrary and capricious where agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Our review of an agency's interpretation of a statute that it administers is further governed by the framework articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).  *See*

*Veterans Just. Grp., LLC v. Sec'y of Veterans Affs.*, 818 F.3d 1336, 1346 (Fed. Cir. 2016) (*VJG*). Under *Chevron*, we first ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If we conclude that it has, "that is the end of the matter," and the only question remaining is whether the regulation at issue accords with congressional intent. *Id.* at 842–43. Under such circumstances, we "must reject administrative constructions which are contrary to clear congressional intent," as ascertained by the "traditional tools of statutory construction" and statutory history. *Id.* at 843 n.9.

If, however, the statute "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The administering agency, under these circumstances, is entitled to make a "reasonable policy choice." *Id.* at 845. Because a court may not simply substitute its own construction of a statutory provision for an agency's reasonable interpretation, such interpretations are afforded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844 (footnote omitted).

B. Supplemental Claims under the AMA

The three regulations for which we find Petitioners MVA and PVA have standing to challenge all pertain to one of the new procedural lanes of AMA review—supplemental claims. Specifically, (1) § 14.636(c)(1)(i) limits when a veteran's representative may charge fees for work on supplemental claims; (2) § 3.2500(b) bars the filing of a supplemental claim when adjudication of the same claim is pending before a federal court; and (3) § 3.155 excludes supplemental claims from the intent-to-file framework. Supplemental claims, as mentioned, permit a claimant to request readjudication of an initial claim based on "new and relevant evidence." § 5108(a). Under the AMA, such

claims have replaced claims to reopen from the legacy system. *Compare* § 5108 (2016), *with* § 5108 (2019).

Several statutory provisions form the basis for the regulations at issue here. First, § 5104C(a) and § 5104C(b) recite a claimant's options for administrative review following an AOJ decision, including the filing of a supplemental claim. Section 5104C(a) governs administrative review "within one year" of an AOJ decision, whereas § 5104C(b) governs administrative review after "more than one year has passed."[10]

---

[10]    38 U.S.C. § 5104C recites, in relevant part:

(a) *Within one year* of decision.

(1) Subject to paragraph (2), in *any* case in which the Secretary renders a decision on a claim, the claimant may take *any of the following actions* on or before the date that is one year after the date on which the [AOJ] issues a decision with respect to that claim:

> (A) File a request for higher-level review under section 5104B of this title.
>
> (B) File a supplemental claim under section 5108 of this title.
>
> (C) File a [NOD] under section 7105 of this title.

(2)

> (A) Once a claimant takes an action set forth in paragraph (1), the claimant may not take another action set forth in that paragraph with respect to the same claim

Within one year of an AOJ decision, a claimant may generally pursue "any" one of three lanes of administrative review by filing: a request for higher-level review, a supplemental claim, or a NOD for Board review. *See* § 5104C(a)(1). This general rule, however, is not without limits, as a claimant cannot *simultaneously* pursue two or more administrative review options for the same claim or issue. *See* § 5104C(a)(2)(A). But nothing can prohibit that claimant from pursuing each administrative review option *in succession*. *See* § 5104C(a)(2)(B).

> or same issue contained within the claim until—
>
> > (i) the higher-level review, supplemental claim, or [NOD] is *adjudicated*; or
> >
> > (ii) the request for higher-level review, supplemental claim, or [NOD] is *withdrawn*.
>
> (B) *Nothing* in this subsection *shall prohibit* a claimant from taking any of the actions set forth in paragraph (1) *in succession* with respect to a claim or an issue contained within the claim.
>
> . . .
>
> (b) *More than one year* after decision. In any case in which the Secretary renders a decision on a claim and more than one year has passed since the date on which the [AOJ] issues a decision with respect to that claim, the claimant may file a supplemental claim under section 5108 of this title.

§ 5104C (emphases added).

By contrast, after more than one year has passed since the AOJ's decision, a claimant is left with only one option for administrative review—filing a supplemental claim. *See* § 5104C(b). Collectively, then, § 5104C establishes two types of supplemental claims based on when the claim is filed: § 5104C(a) supplemental claims filed within a year of an AOJ decision, and § 5104C(b) supplemental claims filed more than a year after an AOJ decision.

Aside from the timing of when they are filed, § 5104C(a) and § 5104C(b) supplemental claims also differ in two additional ways: their effective dates and the VA's duty to notify. Section 5110(a)(2) governs the effective date of awards and explains that supplemental claims "continuously pursued"—i.e., filed within one year of a prior decision from the AOJ, Board, or Veterans Court—are entitled to an effective date reaching back to "the date of filing of the initial application for a benefit" (i.e., the initial claim's filing date). But "supplemental claims received more than one year" after an AOJ or Board decision have an effective date "[no] earlier than the date of receipt of the supplemental claim." *See* § 5110(a)(3). Thus, § 5104C(a) supplemental claims filed in continuous pursuit may reach back to the initial claim's effective date, whereas § 5104C(b) supplemental claims not filed within continuous pursuit are accorded an effective date as of their date of receipt by the VA. *See* § 5110(a)(3). The VA, moreover, has a duty to notify claimants of any information or evidence necessary to substantiate their claims—including § 5104C(b) supplemental claims, *see* § 5103(a)(1)—but § 5104C(a) supplemental claims filed within one year after an AOJ or Board decision are expressly excluded from this duty, *see* § 5103(a)(3).

The final statutory provision at issue in this appeal is § 5904(c)(1), which, unlike the other provisions discussed, does not explicitly reference supplemental claims. This provision generally applies to all VA proceedings and appeals and governs when an attorney or agent may begin to

charge fees for services rendered in connection with a veteran's claim for benefits:

> (c)(1) Except as provided in paragraph (4), in connection with a proceeding before the Department with respect to benefits under laws administered by the Secretary, a fee may *not* be charged, allowed, or paid for services of agents and attorneys with respect to services provided *before the date* on which a claimant is provided notice of the *[AOJ's] initial decision under section 5104 of this title with respect to the case.* The limitation in the preceding sentence does not apply to fees charged, allowed, or paid for services provided with respect to proceedings before a court.

§ 5904(c)(1) (emphases added). Under this provision, the triggering event for when an attorney may begin to charge fees is when the claimant receives notice of the AOJ's "initial decision . . . with respect to the case." *Id.*

Below, we address each of Petitioners' three challenges in turn.

### C.  38 C.F.R. § 14.636(c)(1)(i):  Attorneys' Fees

MVA first challenges the VA's regulation governing attorneys' fees and asserts that this regulation is invalid for treating § 5104C(a) and § 5104C(b) supplemental claims differently, contrary to the clear meaning of § 5904(c)(1).

1

To begin, we find it worthwhile to review the statutory history of restrictions on attorneys' fees for VA benefits claims. Congress has thrice changed the triggering event for when attorneys' fees may be charged, each time shifting the entry point for such fees—and thus a claimant's ability to retain paid representation—earlier in the administrative appeals process.

Previously, attorneys' fees had been strictly limited to $10 since 1864 due to the "relatively uncomplicated procedure" of "applying for VA benefits" in "the initial claim stages," *see* S. Rep. No. 100–418, at 63 (1988), which were "informal and non-adversarial," *see* H.R. Rep. No. 100–963 (1988), at 15. This limitation was left unchanged until 1988, when Congress enacted the Veterans' Judicial Review Act (VJRA), Pub. L. No. 100–687, 102 Stat. 4105 (1988) (codified at scattered sections of 38 U.S.C.), to allow, for the first time, judicial review of VA decisions. H.R. Rep. No. 100–963, at 16. At the same time, Congress also enacted § 5904(c)(1) (formerly 38 U.S.C. § 3404(c)(1)) to relax the existing limitations on attorneys' fees, recognizing the importance of retaining legal counsel in both judicial proceedings and administrative appeals. *See* S. Rep. No. 100–418, at 63–64; H.R. Rep. No. 100–963, at 28.

When first enacted, § 5904(c)(1)'s predecessor permitted attorneys' fees to be charged only after "the [Board] first makes a final decision in the case." *See* § 3404(c)(1) (1988). This was intended to "preserve the non-adversarial initial benefits process, while providing the veteran with the assistance of an attorney when that process has failed and the veteran is faced with the complexities of appealing, reopening, and/or correcting prior adverse decisions." *See Carpenter v. Nicholson*, 452 F.3d 1379, 1383 (2006); *see also Stanley v. Principi*, 283 F.3d 1350, 1356 (2002) ("[S]ection 5904(c) was designed to allow veterans to retain paid counsel in connection with VA proceedings to reopen final Board decisions, but to bar the retention of paid counsel in connection with the original VA proceedings, which were viewed as presenting less complex issues."). The Senate Report distinguished reopening and reconsideration proceedings from the initial proceedings, explaining that "once the [Board] renders a decision adverse to the claimant on the merits, the need for the assistance of an attorney is then markedly greater with respect to such issues as seeking a *reopening and reconsideration* and deciding whether

to proceed to court." *See* S. Rep. No. 100–418, at 63–64 (emphasis added).

Subsequently, in 2006, Congress amended § 5904(c)(1) to shift the triggering event for allowing paid representation from a final Board decision to when "a [NOD] is filed with respect to the case." *See* § 5904(c)(1) (2006). The accompanying legislative remarks explained that the amendment would permit claimants to obtain paid representation "before [the] VA," and not just after a final Board decision. 152 Cong. Rec. S11854, at S11855 (2006) (Sen. Akaka); *see also* 152 Cong. Rec. H8995-02, at H9018 (2006) (Rep. Miller) ("Current law prohibits an attorney from receiving a fee for representing a claimant until the [Board] renders its first decision on the claim. Unfortunately, the claims process has become very complex and can be very overwhelming to some claimants. This provision would give veterans the option of hiring an attorney earlier in the process if the veterans believe they need assistance with their claim."). Because fees could be charged "only after a [NOD] has been filed in a case," the amended statute continued to bar attorneys' fees for the initial application of benefits while, at the same time, expanding a claimant's ability to retain counsel to seek review of an unsatisfactory initial decision by the AOJ. *See* 152 Cong. Rec. S11854, at S11855.

Now, under the AMA, the triggering event for attorneys' fees has once again shifted earlier to permit paid representation after a claimant receives notice of the AOJ's "initial decision . . . with respect to the case." *See* § 5904(c)(1) (2019); *see also* H.R. Rep. No. 115–135, at 3 (explaining this amendment permits "veterans to retain the services of attorneys and accredited agents who charge a fee when the [AOJ] provides notice of the *original decision*" (emphasis added)). As the VA acknowledged in its Final Rule, this amendment was necessary "to allow paid representation with respect to the claimant's *expanded options for seeking review of an initial decision on a claim*." Final

Rule, 84 Fed. Reg. at 150 (emphasis added).  In other words, because claimants are no longer limited to filing a NOD to seek review of an unsatisfactory initial AOJ decision (and can instead file a supplemental claim or request for higher-level review), "Congress necessarily had to shift the entry point for paid representation to the AOJ decision itself" in order "to permit paid representation *regardless of the form of review*." *Id.* (emphasis added).  This shift was part of a continuing congressional effort to enlarge the scope of activities for which attorneys can receive compensation for assisting veterans.

2

Section 14.636(c)(1)(i),[11] titled "[c]ircumstances under which fees may be charged," permits attorneys to charge

---

[11]   38 C.F.R. § 14.636(c)(1)(i) states:

(c) Circumstances under which fees may be charged.  Except as noted in paragraph (d) of this section, agents and attorneys may *only* charge fees as follows:

(1)(i) Agents and attorneys may charge claimants or appellants for representation provided *after an [AOJ] has issued notice of an initial decision* on the claim or claims. . . .  For purposes of this paragraph (c)(1)(i), *an initial decision on a claim would include* an initial decision on an initial claim for an increase in rate of benefit, an initial decision on a request to revise a prior decision based on [CUE] (unless fees are permitted at an earlier point pursuant to paragraph (c)(1)(ii) or paragraph (c)(2)(ii) of this section), and *an initial decision on a supplemental claim that was presented after the final adjudication of an earlier claim*.  However, *a supplemental claim will be considered part of the*

fees for work performed after an AOJ has issued "an initial decision on the claim." *See* § 14.636(c)(1)(i). The regulation, however, treats § 5104C(b) supplemental claims differently from all other forms of administrative review, including § 5104C(a) supplemental claims. *See* Final Rule, 84 Fed. Reg. at 150 (explaining that the regulation "treats supplemental claims differently based on whether they were filed within one year of a prior decision"). Specifically, § 5104C(a) supplemental claims, which are "continuously pursued" within one year of a prior decision, "will be considered part of the earlier [initial] claim," such that attorneys may charge fees for any work performed on the supplemental claim. *Id.* But for § 5104C(b) supplemental claims, which involve claim issues that are no different in substance from § 5104C(a) supplemental claims, fees may only be charged for work performed after "an initial decision on [the] supplemental claim" itself. *Id.* This regulation thus permits claimants to receive paid representation for all work on a § 5104C(a) supplemental claim—including the preparation and filing of such a claim—but requires

---

*earlier claim if the claimant has continuously pursued the earlier claim* by filing any of the following, either alone or in succession: A request for higher-level review, *on or before one year* after the date on which the [AOJ] issued a decision; a supplemental claim, *on or before one year* after the date on which the [AOJ] issued a decision; a [NOD], *on or before one year* after the date on which the [AOJ] issued a decision; a supplemental claim, *on or before one year* after the date on which the Board of Veterans' Appeals issued a decision; or a supplemental claim, *on or before one year* after the date on which the Court of Appeals for Veterans Claims issued a decision.

§ 14.636(c)(1)(i) (emphases added).

a § 5104C(b) supplemental claim to be first denied before
paid representation is available.

MVA urges us to invalidate § 14.636(c)(1)(i) for con-
travening the clear statutory basis for this regulation as
set forth in § 5904(c)(1).  Specifically, MVA argues that the
regulation's unequal treatment of § 5104C(a) and
§ 5104C(b) supplemental claims violates the AMA's "unam-
biguous[] require[ment] that all work on supplemental
claims be capable of compensation."  Pet'r Br. (No. 19-1600)
at 49.  MVA contends that nothing in the statute limits fees
for § 5104C(b) claims or otherwise distinguishes fees for
different types of supplemental claims.    Instead,
§ 5904(c)(1) restricts only fees charged before an AOJ's "in-
itial decision . . . with respect to the case," and a supple-
mental claim is part of the same "case" as the initial claim,
whether continuously pursued within a year of a prior de-
cision or not.

The government does not attempt to argue that
§ 5904(c)(1)'s text directly supports differential treatment
of § 5104C(a) and § 5104C(b) supplemental claims as to
paid representation.  Instead, it argues that the VA's regu-
lation deserves deference because the VA has an estab-
lished practice of treating motions to reopen "finally-
decided claims based on new evidence" as a "separate
case[]" for the purposes of attorneys' fees, which it purports
are analogous to § 5104C(b) supplemental claims under the
AMA, and nothing in the AMA or its statutory history in-
dicates that Congress intended for the VA to deviate from
this practice.  Resp't Br. (No. 19-1600) at 41.  The govern-
ment also contends that the regulation is consistent with
congressional intent because the AMA itself treats
§ 5104C(a) and § 5104C(b) supplemental claims differently
by assigning different effective dates and imposing differ-
ent notification duties on the VA.  We disagree and con-
clude that § 14.636(c)(1)(i) contradicts the unambiguous
meaning of § 5904(c)(1), which permits paid representation

for all forms of administrative review under the AMA, including § 5104C(b) supplemental claims.

Starting with the words of the statutory provision itself, § 5904(c)(1) states that attorneys' fees may not be charged for services provided before the date a claimant receives notice of the AOJ's "initial decision . . . with respect to the case." On its face, the provision recites no other restriction on attorneys' fees. Nor does the provision distinguish between work performed on different types of administrative review under the AMA. Because all such review work necessarily occurs after the AOJ issues an "initial decision . . . with respect to the case," a straightforward reading of § 5904(c)(1) indicates that work on all forms of review under the AMA—including § 5104C(b) supplemental claims—should be compensable.

Our reading of the statutory provision also comports with legislative intent, as supported by the statutory history. As the VA acknowledges, Congress shifted § 5904(c)(1)'s entry point for paid representation from the filing of a NOD to receiving notice of the AOJ's initial decision "to permit paid representation *regardless of the form of review*" a claimant chooses. *See* Final Rule, 84 Fed. Reg. at 150 (emphasis added). After receiving the AOJ's initial decision, a claimant may initiate review of that decision by either filing a NOD, requesting higher-level review, or filing a supplemental claim—even if that supplemental claim is filed "more than one year [after] the date on which the [AOJ] issues a decision with respect to [the initial] claim." *See* § 5104C(b); *see generally* § 5104C (titled "[o]ptions following decision by [AOJ]" and including both § 5104C(a) and § 5104C(b) supplemental claims among such options). All are "form[s] of review" under the AMA. Section 5904(c)(1), moreover, is devoid of any indication that § 5104C(b) supplemental claims should be treated differently from other types of administrative review for purposes of attorneys' fees. Yet, no other form of review is

subject to the same restrictions on attorneys' fees under the VA's regulation.

We also reject the government's argument that a § 5104C(b) supplemental claim filed more than a year after a prior decision is not part of the same "case" as that earlier decision, thereby barring attorneys from charging fees for any work on such claims until the supplemental claim itself is rejected. Logic dictates that § 5104C(b) supplemental claims, like any other form of administrative review under the AMA, should be construed as part of the same "case" as the initial AOJ decision being reviewed, just as an appeal or motion for reconsideration in litigation is considered part of the same "case" as the underlying decision. *See* 38 U.S.C. § 101(36) (defining "supplemental claim" as "a claim for benefits . . . filed by a claimant who had previously filed a claim for the *same or similar* benefits on the *same or similar* basis" (emphases added)). While neither § 5904(c)(1) nor any other provision of the AMA defines the term "case," the parallel language in § 5104C(a) and § 5104C(b) suggests that supplemental claims belong to the same "case" as the initial decision being reviewed, regardless of when they are filed. *Compare* § 5104C(a) ("in any *case* in which the Secretary renders a decision on a claim, the claimant may" file a supplemental claim within one year of when the AOJ issues a decision with respect to that claim (emphasis added)), *with* § 5104C(b) ("[i]n any *case* in which the Secretary renders a decision on a claim and more than one year has passed since the date [the AOJ] issues a decision with respect to that claim, a claimant may file a supplemental claim" (emphasis added)).

Although the government correctly notes that § 5104C(b) supplemental claims may have a different effective date and duty to notify than § 5104C(a) supplemental claims, *see* §§ 5110(a)(3), 5103(a)(3), we see no reason why these distinctions should matter in the context of charging attorneys' fees. That § 5104C(b) supplemental claims are not entitled to an effective date reaching back to the initial

claim merely reflects Congress's efforts to "streamline" the "broken" legacy appeals process that allowed for "repeated revisions and resubmissions of claims while maintaining an effective date for benefits based upon the original filing date of the claim." *See* H.R. Rep. 115–135, at 8. Restricting the effective date of § 5104C(b) supplemental claims simply reflects a legislative choice to award claimants who delayed seeking review of their claims for over a year fewer benefits than those who "continuously pursued" administrative review. It says nothing of Congress's intent to restrict attorneys' fees or limit a claimant's ability to retain paid representation for § 5104C(b) supplemental claims. The government, moreover, has not identified any differences in the work that an attorney would perform on a § 5104C(a) claim as opposed to a § 5104C(b) claim that would justify compensating the former but not the latter.

As for the VA's "longstanding interpretation" of legacy reopening claims as belonging to a "case" separate from that of the original claim for benefits, the government argues that "Congress has now amended section 5904(c) twice and has not overruled [the] VA's statutory interpretation." Resp't Br. (No. 19-1600) at 46. From this purported inaction, the government presumes that Congress has implicitly ratified the VA's practice of restricting paid representation for legacy reopening claims and, by extension, for any "post-final decision claims based on new evidence." *Id.* at 47. This argument suffers from several flaws. Included among them is our express rejection of the VA's interpretation in both *Stanley* and *Carpenter*, discussed *infra*.

To begin with, an implicit ratification theory holds no water where, as here, the regulation at issue clearly contradicts the requirements of the statutory provision. *See Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("There is an obvious trump to the reenactment argument . . . in the rule that where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative

construction."); *id.* at 122 ("A regulation's age is no antidote to clear inconsistency with a statute, and the fact [that the regulation] flies against the plain language of the statutory text exempts courts from any obligation to defer to it."). Reenactment, moreover, "[cannot] carry the day" where "there is no . . . evidence to suggest Congress was even aware of the VA's interpretative position." *Id.* Here, as we have concluded, § 14.636(c)(1)(i)'s differential treatment of § 5104C(b) supplemental claims clearly contravenes § 5904(c)(1)'s requirement that paid representation be available for all forms of administrative review under the AMA. We also see no indication that Congress was aware of the VA's regulations restricting paid representation for reopening claims or distinguishing such claims as separate from "the case" of the initial claim. Under such circumstances, we reject the government's implicit ratification argument.

Far from "inaction" that would suggest implicit ratification of preexisting practices, the AMA dramatically overhauled the VA appeals process by replacing the "broken," one-size-fits-all legacy system with a new three-lane system. Given the extent and nature of the AMA's reforms, we think it unlikely that Congress intended to preserve the VA's "longstanding interpretation" of the fee statutory provision from the superseded legacy system, especially where the regulation at issue contradicts both the plain and ordinary meaning of the statutory provision and the statutory history. The AMA's three-lane system was intended to alleviate the legacy system's growing appeals backlog by allowing claimants to choose from new and more efficient administrative review pathways specifically tailored for their needs. But the AMA's reforms can only succeed if claimants are able to avail themselves of these additional pathways, and Congress, in turn, amended the fee provision to provide claimants with paid representation regardless of the form of administrative review sought. We would do little justice to Congress's amendments by clinging to a

legacy administrative practice that markedly restricts paid representation for one lane of review. *Cf. Stanley*, 283 F.3d at 1356 (explaining that Congress amended the fee provision in 1988 because the "new right to judicial review" under the VJRA "would be a hollow right indeed without some easing of the limitation on attorneys' fees" (quoting S. Rep. No. 100–418, at 63)).

Lastly, we reject the government's proposition that this court has previously endorsed the VA's longstanding interpretation of the fee provision—that is, "the basic principle that a reopening proceeding is separate from the original case" and thus foreclosed from paid representation until the VA issues a decision on the reopening claim itself. Resp't Br. (No. 19-1600) at 39 (citing *Stanley*, 283 F.3d at 1358). Even assuming, as the government contends, that § 5104C(b) supplemental claims under the AMA are analogous to legacy reopening claims, we have never denied attorneys' fees for work performed on reopening proceedings based on the VA's understanding of "case." To the contrary, our decisions in *Stanley* and *Carpenter* reinforce our textual analysis that § 5904(c)(1) plainly permits paid representation for all forms of administrative review after the AOJ's initial decision on the original claim for benefits.

In *Stanley*, we considered an earlier (and more restrictive) version of the fee provision prohibiting attorneys from collecting fees until "the [Board] first makes a final decision in the case." *See* § 5904(c) (2000). The issue before us was whether an attorney could collect fees for work performed on a legacy reopening claim filed more than a year after an AOJ's initial decision, which thus became final. We held that such fees were permissible because § 5904(c) "was designed to allow attorneys' fees after the initial claims proceeding, in connection with proceedings to *reopen a claim on the ground of new and material evidence* or [CUE]," 283 F.3d at 1352 (emphasis added), and "[t]he retention of paid counsel would have been permissible at the point when the [AOJ's initial] decision became 'final,'" *id.* at 1357. In other

words, even under a more limited version of the fee provision, we permitted paid representation for administrative review proceedings filed more than a year after the AOJ's initial decision and based on new and material evidence. While *Stanley* described the "reopening proceeding . . . [as] a separate 'case'" having a "final decision," that statement was made to *allow*, rather than *deny*, paid representation for reopening work under the then-existing fee provision, which required a "final decision" for attorneys' fees to be charged. *See id.* at 1358.

We later clarified *Stanley*'s reasoning in *Carpenter*, explaining that "a veteran's claim based on the specified disability does not become a different 'case' at each stage of the often lengthy and complex proceedings, including remands *as well as reopenings as in Stanley*." 452 F.3d at 1384 (emphasis added). Specifically, in *Carpenter*, we concluded that a later CUE challenge (which is necessarily filed after a decision on the original claim has become final and cut off from direct review) is part of the same "case" as other challenges to the initial decision. *See id.* at 1384. Attorneys may charge fees for work on CUE claims, we explained, because the fee provision "was designed to authorize compensation for attorney services rendered after the initial proceedings, undertaken by the veteran, have failed." *Id.* A "case" therefore "encompasses all potential claims raised by the evidence, applying all relevant laws and regulations, regardless of whether the claim is specifically labeled." *Id.* Just as a CUE claim belongs to the same "case" as a veteran's original claim for benefits, thereby permitting paid representation for work performed after an AOJ's initial decision, so too does a § 5104C(b) supplemental claim seeking the "same or similar benefits on the same or similar basis" as the original claim. *See* § 101(38).

For these reasons, we hold that § 14.636(c)(1)(i) is contrary with the plain and ordinary meaning of § 5904(c)(1), and we thus invalidate that regulatory provision.

D.  38 C.F.R. § 3.2500(b):  Prohibition on Concurrent Sup-
    plemental Claim and Federal Court Appeal

Section 3.2500(b) places two restrictions on the use of
administrative review:

> (b) Concurrent election prohibited.  With regard to
> the adjudication of a claim or an issue as defined in
> § 3.151(c), a claimant who has filed for review un-
> der one of the options available under paragraph
> (a) of this section[12] *may not, while that review is
> pending final adjudication, file for review under a
> different available option.*  While the adjudication
> of a specific benefit is pending *on appeal before a
> federal court, a claimant may not file for*

---

[12]  38 C.F.R. § 3.2500(a), titled "[r]eviews available,"
summarizes a claimant's three "administrative review op-
tions" under the AMA:

> (1) *Within one year* from the date on which the
> [AOJ] issues a notice of a decision on a claim or is-
> sue as defined in § 3.151(c), except as otherwise
> provided in paragraphs (c), (e), and (f) of this sec-
> tion, a claimant may elect one of the following ad-
> ministrative review options by timely filing the
> appropriate form prescribed by the Secretary:
>
> > (i) A request for higher-level review under
> > § 3.2601 or
> >
> > (ii) An appeal to the Board under § 20.202
> > of this chapter.
>
> (2) *At any time after* VA issues notice of a decision
> on an issue within a claim, a claimant may file a
> supplemental claim under § 3.2501.

§ 3.2500(a) (emphases added).

> *administrative review of the claim* under any of [the] options listed in paragraph (a) of this section.

§ 3.2500(b) (emphases added). First, this regulation prohibits claimants from pursuing two concurrent lanes of administrative review for the same "claim or [] issue." Separately, § 3.2500(b) also prohibits claimants from filing for administrative review of a claim "[w]hile adjudication of a specific benefit is pending on appeal before a federal court."

PVA challenges only the validity of § 3.2500(b)'s second prohibition on concurrent administrative and judicial review. We note, as an initial matter, that the only form of administrative review that is potentially available for a claim already pending on appeal before a federal court is a supplemental claim.[13] Thus, this prohibition primarily affects claimants who have already appealed their claim to a federal court (from an adverse Board decision) but believe they have "new and relevant evidence" for that same claim that could entitle them to benefits.[14] This regulation bars such claimants from filing a supplemental claim with the VA based on that "new and relevant evidence" while judicial appeal of their initial claim remains pending before this court or the Supreme Court. They must instead wait

---

[13] This follows because only a final Board decision (initiated by filing a NOD) may be appealed to a federal court, and there can be no higher-level review by the AOJ of a final Board decision.

[14] We assume that the VA meant "federal court" in § 3.2500(b) to include the Veterans Court, even though the Veterans Court is "an Executive Branch entity," *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1984 (2021). Regardless, we hold that § 5104C, our statutory basis for invalidating § 3.2500(b), permits a veteran to file a supplemental claim at any time after receiving an adverse Board decision.

until the judicial appeal concludes to file any such supplemental claims.

This prohibition, PVA argues, is invalid because it "imposes new restrictions that are not contemplated in the statute." Pet'rs Br. (No. 19-1680) at 24. While § 5104C(a)(2)(A)[15] appears to provide a statutory basis for § 3.2500(b)'s first prohibition against concurrent lanes of administrative review, no statutory provision directly supports § 3.2500(b)'s second prohibition against concurrent administrative and judicial review. *Id.* PVA further contends that this prohibition harms claimants in two ways. First, § 3.2500(b) can delay a claimant's receipt of benefits. A claimant possessing "new and relevant evidence" that would entitle the claimant to benefits must wait until an ongoing judicial appeal concludes before a supplemental claim requesting readjudication based on that new evidence can be filed.

But more importantly, PVA contends, claimants seeking to appeal an adverse Veterans Court decision are forced to make a "hard choice" between pursuing appellate review beyond the Veterans Court and filing a supplemental claim within continuous pursuit. Pet'rs Br. (No. 19-1680) at 24–26. This follows because § 5110(a)(2)—the statutory provision governing effective dates of "continuously pursued" claims—does not, on its face, recite that supplemental claims filed within one year of a Federal Circuit or Supreme Court decision are entitled to their original effective date. Such effective date protections are instead only expressly recited for supplemental claims filed within one year of a Veterans Court decision, a Board decision, or an

---

[15] Section 5104C(a)(2)(A) explains that once a claimant pursues one lane of administrative review, the claimant cannot pursue another lane of administrative review "with respect to the same claim or issue until" that first review is "adjudicated" or "withdrawn."

AOJ decision.    *See* § 5110(a)(2)(B), (D)–(E);[16] *see also* § 3.2500(c), (h)(1) (implementing regulations reflecting same).    Accordingly, while a claimant may still file a supplemental claim after unsuccessfully appealing an adverse Veterans Court decision to this court or the Supreme

---

[16]    38 U.S.C. § 5110(a)(2) recites:

(2) For purposes of determining the effective date of an award under this section, the date of application shall be considered *the date of the filing of the initial application for a benefit if the claim is continuously pursued* by filing any of the following, either alone or in succession:

> (A)  A request for higher-level review under section 5104B of this title on or before the date that is one year after the date on which the [AOJ] issues a decision.
>
> (B)  *A supplemental claim* under section 5108 of this title on or before the date that is one year after the date on which the *[AOJ] issues a decision.*
>
> (C)  A [NOD] on or before the date that is one year after the date on which the [AOJ] issues a decision.
>
> (D)   A *supplemental claim* under section 5108 of this title on or before the date that is one year after the date on which the *[Board] issues a decision.*
>
> (E)   A supplemental claim under section 5108 of this title on or before the date that is one year after the date on which the *[Veterans Court] issues a decision.*

§ 5110(a)(2) (emphases added).

Court, the claimant risks losing entitlement to the original effective date for any benefits awarded on that supplemental claim. On the other hand, a claimant who chooses *not* to appeal an adverse Veterans Court decision and instead files a supplemental claim within continuous pursuit will retain the initial claim's original effective date for any benefits awarded. § 5110(a)(2)(E). But in doing so, that claimant gives up the opportunity to have this court review the Veterans Court's legal rulings under 38 U.S.C. § 7292. Consequently, PVA argues, § 3.2500(b) improperly forces claimants "to choose between pursuing the appeal rights granted to them by statute . . . and protecting their effective date of benefits." Pet'rs Br. (No. 19-1680) at 23.

The government responds that, as a threshold matter, the primary harm PVA complains of—loss of effective date—will soon be irrelevant because the "VA plans to propose a regulatory change [to § 3.2500(c), (g)] to protect the effective dates of supplemental claims" filed within one year of a decision by this court or the Supreme Court. Resp't Br. (No. 19-1680) at 17. But more to the point, the government argues, § 3.2500(b)'s requirement that claimants pursue administrative review sequentially (rather than concurrently) with judicial review in the federal courts is consistent with the AMA and should be sustained because it "reasonably promotes systemic efficiency without prejudicing claimants." *Id.* at 10.

We note that it has been over a year since the government filed its brief, and we have yet to see a notice of proposed rulemaking for the regulatory changes mentioned. Instead, on March 19, 2020, the VA issued a policy letter stating that "[e]ffective immediately, claims adjudicators must consider supplemental claims . . . filed within one year of a Federal Circuit or Supreme Court decision as continuously pursued and apply the provisions of 38 C.F.R. § 3.2500(h)(1) when adjudicating the claim." *See* VA Policy Letter 20–01 (Mar. 19, 2020).

It is unclear what effect, if any, the VA's unfulfilled promise of forthcoming regulatory amendments and subsequent policy letter has on our analysis of § 3.2500(b)'s validity. But we ultimately need not resolve that question here. For even if the VA had amended its regulations through notice-and-comment rulemaking to extend effective date protections for supplemental claims filed within a year of a Federal Circuit or Supreme Court decision,[17] we would nonetheless conclude that § 3.2500(b)'s bar on filing a supplemental claim during the pendency of a federal court appeal is invalid for contradicting the plain and ordinary meaning of § 5104C.

Both parties agree that while § 5104C expressly bars concurrent lanes of *administrative* review, *see* § 5104C(a)(2)(A), it does not expressly prohibit concurrent administrative and *judicial* review. Thus, nothing in this statutory provision nor any other provision of the AMA expressly prohibits filing a supplemental claim during a pending appeal in federal court. The government interprets the absence of such a provision as a statutory gap for the VA to fill. *See* Resp't Br. (No. 19-1680) at 15–16. It contends that § 3.2500(b) is a reasonable construction of § 5104C(a)(2)(A) warranting deference because the additional prohibition against concurrent administrative and judicial review is consistent with the AMA's efficiency goals. We disagree and conclude that § 5104C leaves no gap to be filled because it unambiguously permits claimants to file supplemental claims while judicial review of the same underlying claim or issue is pending in federal court.

Section 5104C broadly authorizes a claimant to file a supplemental claim "[i]n *any* case in which the Secretary renders a decision on a claim," whether filed within one year of an AOJ decision or not. *See* § 5104C(a)(1)(B), (b)

---

[17] We make no conclusions as to whether such an amended regulation, if promulgated, would be valid.

(emphasis added); *see also* H.R. Rep. No. 115–135, at 10 (explaining that § 5104C(b) would "[c]larify that in any case in which more than one year has passed in which the AOJ has issued a decision denying a claim, the claimant may file a supplemental claim"). Yet this broad authorization, as we have noted, is not without limits. Once a claimant has initiated one lane of administrative review, that claimant "may not" pursue another lane, such as filing a supplemental claim, "*until* the higher-level review, supplemental claim, or [NOD] is adjudicated[] or . . . withdrawn." § 5104C(a)(2)(A) (emphasis added). But while the adjudication or withdrawal of any prior administrative review is a prerequisite to filing a subsequent supplemental claim, no provision of the AMA requires completion of an ongoing judicial review as yet another hurdle to filing a supplemental claim.

To the contrary, § 5104C(a)(2)(A) demonstrates that Congress knew how to bar two simultaneous forms of review but chose to only bar concurrent lanes of administrative review. That Congress did not include an analogous provision also barring concurrent administrative and judicial review suggests that it simply did not intend to do so. *Cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). At the same time, § 5104C(a)(2)(B) makes clear that "*[n]othing* in this subsection shall prohibit a claimant from taking [administrative review actions] *in succession*." *See* § 5104C(a)(2)(B) (emphases added). Section 5104C(a)(2)(B), then, protects a

claimant's ability to file a supplemental claim following an unsatisfactory Board decision, and we see nothing in the AMA that would change this outcome once that Board decision is appealed to the Veterans Court. Accordingly, § 5104C, read in its entirety, makes clear that a claimant whose initial claim is on appeal before a federal court does not have to wait until the completion of that appeal to file a supplemental claim.

The government responds that our reading of § 5104C undermines Congress's broad intent to improve the timely administration of the VA benefits program and reintroduces some of the inefficiencies the AMA sought to eliminate. Resp't Br. (No. 19-1680) at 19–20. But nothing in the AMA's text or statutory history suggests that the concerns driving Congress's reforms to the VA's legacy *administrative* review process are also implicated by concurrent judicial and supplemental claim review. Instead, permitting a claimant to file a supplemental claim during the long pendency of a judicial appeal could result in an earlier award of benefits, which is consistent with, and not contrary to, the AMA's goal of reducing protracted wait times for receiving a final decision on benefits. The statutory text and statutory history, moreover, indicate that Congress intended to allow supplemental claims to be filed "in any case in which more than one year has passed in which the AOJ has issued a decision denying a claim." H.R. Rep. No. 115–135, at 10; *see also* § 5104C(b). To the extent that the broad availability of supplemental claims undermines the AMA's efficiency goals, Congress already addressed that concern through § 5104C(a)(2)(A)'s express prohibition on simultaneously pursuing two different lanes of administrative review, and nothing indicates that Congress had similar concerns about concurrent judicial and supplemental claim review. For these reasons, we conclude that our reading of § 5104C is consistent with, and not contrary to, congressional intent under the AMA.

Because we conclude that § 5104C's statutory text unambiguously permits filing a supplemental claim during the pendency of an appeal before a federal court, we need not proceed to *Chevron*'s second step to consider the VA's policy justifications for the regulation. We therefore hold that § 3.2500(b) is invalid for contravening § 5104C's clear statutory text.

### E.  38 C.F.R. § 3.155:  Intent-to-File Framework

For claimants to receive VA benefits, "[a] specific claim in the form prescribed by the Secretary . . . must be filed." *See* § 5101(a)(1). The VA, however, has long permitted claimants to establish a claim's effective date through a preliminary submission indicating an intent to apply for benefits, which serves as a placeholder until the claimant files a formal application for benefits within a specified period. *See VJG*, 818 F.3d at 1341. Under the current "intent-to-file" framework,[18] a claimant who signals an intention to apply for benefits through a format specified by regulation, and later completes a formal application for benefits within one year, will be afforded an effective date as of the day the intent-to-file was signaled. *See id.* at 1342.

---

[18] The "intent-to-file" framework was implemented in September 2014 to replace the previous "informal claims" framework. *See Standard Claims and Appeals Forms*, 79 Fed. Reg. 57,660 (Sept. 25, 2014); *see also* § 3.155(a) (2014). Under the "intent-to-file" framework, a claimant may signal a preliminary intent to apply for benefits by (1) saving an electronic application within a VA web-based claims application system; (2) submitting a VA standard form in either paper or electronic form; or (3) oral communication with designated VA personnel regarding the claimant's intent to file a claim. *See* § 3.155(b)(1)(i)–(iii).

Section § 3.155 governs the "manner and methods in which a claim can be initiated and filed," including the intent-to-file process set forth in § 3.155(b). The regulation's preamble expressly excludes supplemental claims—but not initial claims—from § 3.155(b)'s intent-to-file framework:

> The following paragraphs describe the manner and methods in which a claim can be initiated and filed. The provisions of this section are applicable to all claims governed by part 3, *with the exception that paragraph (b) of this section, regarding intent to file a claim, does not apply to supplemental claims*.

§ 3.155 (emphasis added).

In the Final Rule, the VA explained that the AMA's amendments to § 5110 required differential treatment of initial and supplemental claims. *See* 84 Fed. Reg. at 142. Because § 5110 "prescribes a one-year filing period" during which claimants may pursue supplemental claims while maintaining the initial claim's effective date, applying the intent-to-file framework "would allow for supplemental claim[s] [submitted] beyond the one-year period" to retain an earlier effective date, contrary to § 5110(a)(3)'s requirement that the effective date of such supplemental claims "shall not be earlier than the date of receipt." *See id.*

PVA argues that this regulation is arbitrary and capricious because the VA interprets "virtually identical" statutory language in § 5110(a)(1) and § 5110(a)(3) inconsistently. Section 5110(a)(3) states that the effective date of § 5104C(b) supplemental claims "shall not be earlier than the date of receipt of the supplemental claim," and § 5110(a)(1) likewise requires that the effective date of an initial claim "shall not be earlier than the date of receipt of application therefor." It thus makes little sense, PVA contends, for the VA to interpret this substantially similar language to forbid an intent-to-file submission in one instance but not another. PVA also argues that the VA's explanation for this rule runs counter to another regulatory

provision that permits claimants who have filed an incomplete supplemental claim form to retain that filing date as their effective date so long as they submit a complete supplemental claim form within 60 days. *See* § 3.155(d)(1)(i) ("Upon receipt of a communication indicating a belief in entitlement to benefits that is submitted . . . on a supplemental claim form . . . that is not complete," the Secretary "shall notify the claimant . . . of the information necessary to complete the application form" and "[i]f VA receives a complete claim within 60 days of notice by VA that an incomplete claim was filed, it will be considered filed as of the date of receipt of the incomplete claim.").

The government, for its part, does not defend the validity of § 3.155's preamble. Rather than litigate the regulation on the merits, the government asks that we dismiss and remand this challenge back to the agency. Specifically, "without conceding that [PVA's] challenge is meritorious," it avers that the "VA plans to propose a regulation to amend [§] 3.155 to apply the intent[-]to[-]file rule to [§] 5104C(b) supplemental claims" such that "[PVA's] challenge will become moot." Resp't Br. (No. 19-1680) at 43. But if the proposed amendments to § 3.155 have not materialized by the time we render judgment in this matter, the government requests a voluntary remand for the VA to complete its rulemaking process. *See id.* at 43–44.

We decline, as a threshold matter, to grant the government's request for voluntary remand. Much as was the case for the promised regulatory changes to § 3.2500(b), we have yet to see any indication that the VA will amend § 3.155's preamble to include supplemental claims within the intent-to-file framework. While courts have discretion to grant a request for voluntary remand so that the agency can reconsider its previous position, *see SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001), the VA has already had quite some time to revise a plainly invalid regulation but failed to do so. Although the VA assured this court that it would make certain amendments to two

of its regulations, several months have now passed since oral argument, and not one of these regulatory amendments has materialized. Nor has the VA provided any updates or a timeline for when such changes might occur. Under these circumstances, we are unpersuaded that a remand to the VA would be of any benefit, and we see no reason to avoid resolving the ultimate question of validity.

Turning to the merits, we agree with PVA that § 3.155's exclusion of supplemental claims from the intent-to-file framework is arbitrary and capricious. The VA's proffered explanation for this rule squarely contradicts other provisions of this regulation (i.e., § 3.155(d)(1)(i)) demonstrating that the effective date of a supplemental claim can, in fact, be earlier than the date that the VA receives the completed supplemental claim. Much like § 3.155(b)'s intent-to-file framework, this provision effectively permits a preliminary submission "indicating a belief in entitlement to benefits" to serve as an effective date placeholder for the later completed supplemental claim.

Moreover, it is a well-established canon of statutory construction that Congress is presumed to have intended for "identical words used in different parts of the same act . . . to have the same meaning." *See Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934) (in turn quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932))). To overcome this presumption, the VA must demonstrate that it engaged in reasoned decision-making by providing an "adequate explanation" for its difference in interpretation of similarly worded statutory provisions. *See Nat'l Org. of Veterans' Advocs. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (setting aside regulation because the VA "purport[ed] to interpret virtually identical language contained in related veterans' benefits statutes to mean different things, without providing an adequate explanation for the inconsistency"); *see also State Farm*, 463 U.S. at 34

(arbitrary and capricious standard requires that an agency demonstrate that it engaged in reasoned decision-making by providing an "adequate basis and explanation" for its decision). Here, the VA has not offered any explanation for why it interpreted the substantively identical language in § 5110(a)(1) and § 5110(a)(3) inconsistently. If the application for an initial claim is "deem[ed] . . . to have been received as of the date of the intent to file a claim," we see no reason why that same interpretation may not also apply to deem a supplemental claim received as of the date of the intent-to-file submission. For these reasons, we hold that the VA acted arbitrarily and capriciously in excluding supplemental claims from the intent-to-file framework. Section 3.155's preamble, to the extent that it does so, is invalid.

## CONCLUSION

In sum, MVA and PVA collectively have associational standing to challenge the validity of § 14.636(c)(1)(i), § 3.2500(b), and § 3.155, and no Petitioner has demonstrated standing to challenge the validity of any other regulatory provisions raised in the petitions. We hold that all three regulatory provisions that MVA and PVA have standing to challenge are invalid. Section 14.636(c)(1)(i)'s restriction on attorneys' fees for § 5104C(b) supplemental claims is invalid because it contravenes the plain and ordinary meaning of § 5904(c)(1), which permits paid representation once a claimant receives notice of the AOJ's "initial decision . . . with respect to the case." Section 3.2500(b)'s bar on filing supplemental claims during the pendency of a judicial appeal is invalid for contravening § 5104C's clear authorization for filing supplemental claims "[i]n *any* case in which the Secretary renders a decision on a claim." Lastly, § 3.155's preamble excluding only supplemental claims from the intent-to-file framework is arbitrary and capricious because the VA failed to adequately explain its inconsistent treatment of initial and supplemental claims given the substantially similar statutory language in

§ 5110(a)(1) and § 5110(a)(3).   Accordingly, we grant-in-part and dismiss-in-part MVA's and PVA's petitions in Appeal Nos. 19-1600 and 19-1680, and we dismiss the remaining two petitions in Appeal Nos. 19-1685 and 19-1687 in their entirety.

### GRANTED-IN-PART AND DISMISSED-IN-PART

#### COSTS

No costs.